# EXHIBIT 1

# In the United States Court of Federal Claims

(Filed September 26, 2001)

| | | |
|---|---|---|
| ****************************************** | * | |
| YANKEE ATOMIC ELECTRIC COMPANY | * | |
| CONNECTICUT YANKEE ATOMIC POWER COMPANY | * | |
| MAINE YANKEE ATOMIC POWER COMPANY | * | Case Nos. |
| FLORIDA POWER & LIGHT COMPANY | * | 98-126C, 98-154C, |
| NORTHERN STATES POWER COMPANY | * | 98-474C, 98-483C, |
| DUKE POWER, A Division of DUKE ENERGY CORP. | * | 98-484C, 98-485C, |
| INDIANA MICHIGAN POWER COMPANY | * | 98-486C, 98-488C, |
| SACRAMENTO MUNICIPAL UTILITY DISTRICT | * | 98-614C, 98-621C, |
| SOUTHERN NUCLEAR OPERATING COMPANY, et al. | * | 99-447C, 00-440C, |
| COMMONWEALTH EDISON COMPANY | * | 00-697C, 00-703C, |
| BOSTON EDISON COMPANY | * | 01-115C, 01-116C, |
| GPU NUCLEAR, INCORPORATED | * | 01-249C |
| WISCONSIN ELECTRIC POWER COMPANY | * | |
| POWER AUTHORITY OF THE STATE OF NEW YORK | * | UNCONSOLIDATED |
| OMAHA PUBLIC POWER DISTRICT | * | |
| NEBRASKA PUBLIC POWER DISTRICT | * | Judge Diane Gilbert Weinstein |
| TENNESSEE VALLEY AUTHORITY | * | |
| | * | Discovery Judge |
| Plaintiffs, | * | |
| v. | * | |
| THE UNITED STATES, | * | |
| Defendant. | * | |
| ****************************************** | | |

# Order

As discussed at the discovery Status Conference held on September 20, 2001, the Joint Motion for an Order for Consolidated Discovery filed on July 10, 2001, is granted, with the exception of Document Production ¶ G. Parties are granted an enlargement of time until October 1, 2001, to submit a plan addressing the production of e-mail messages.

Defendant is ordered to file a report within ten days of the conclusion of written discovery stating whether it intends to file a motion for summary judgment and the basis therefor.

DIANE GILBERT WEINSTEIN
Judge, U.S. Court of Federal Claims

# EXHIBIT 2

# UNITED STATES
# COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ********************************************** | |
| YANKEE ATOMIC ELECTIC COMPANY | * Case Nos.: |
| CONNETICUT YANKEE ATOMIC POWER COMPANY | * 98-126C |
| MAINE YANKEE ATOMIC POWER COMPANY | * 98-154C |
| FLORIDA POWER & LIGHT COMPANY | * 98-474C |
| NORTHERN STATES POWER COMPANY | * 98-483C |
| DUKE POWER, A Division of DUKE ENERGY CORP. | * 98-484C |
| INDIANA MICHIGAN POWER COMPANY | * 98-485C |
| SACRAMENTO MUNICIPAL UTILITY DISTRICT | * 98-486C |
| SOUTHERN NUCLEAR OPERATING COMPANY, et at. | * 98-488C |
| COMMONWEALTH EDISON COMPANY | * 98-614C |
| BOSTON EDISON COMPANY | * 98-621C |
| GUP NUCLEAR, INCORPORATTED | * 99-447C |
| WISCONSIN ELECTRIC POWER COMPANY | * 00-440C |
| POWER AUTHORITY OF THE STATE OF NEW YORK | * 00-697C |
| OMAHA PUBLIC POWER DISTRICT | * 00-703C |
| TENNESSEE VALLEY AUTHORITY | * 01-115C |
| Plaintiffs, | * 01-116C |
| v. | * 01-249C |
| | * |
| THE UNITED STATES, | * |
| Defendant. | * |
| ********************************************** | |

Pages: 1 through 58

Place: Washington, D.C.

Date: September 20, 2001

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| YANKEE ATOMIC ELECTIC COMPANY | Case Nos.: |
| CONNETICUT YANKEE ATOMIC POWER COMPANY | 98-126C |
| MAINE YANKEE ATOMIC POWER COMPANY | 98-154C |
| FLORIDA POWER & LIGHT COMPANY | 98-474C |
| NORTHERN STATES POWER COMPANY | 98-483C |
| DUKE POWER, A Division of DUKE ENERGY CORP. | 98-484C |
| INDIANA MICHIGAN POWER COMPANY | 98-485C |
| SACRAMENTO MUNICIPAL UTILITY DISTRICT | 98-486C |
| SOUTHERN NUCLEAR OPERATING COMPANY, et at. | 98-488C |
| COMMONWEALTH EDISON COMPANY | 98-614C |
| BOSTON EDISON COMPANY | 98-621C |
| GUP NUCLEAR, INCORPORATTED | 99-447C |
| WISCONSIN ELECTRIC POWER COMPANY | 00-440C |
| POWER AUTHORITY OF THE STATE OF NEW YORK | 00-697C |
| OMAHA PUBLIC POWER DISTRICT | 00-703C |
| TENNESSEE VALLEY AUTHORITY | 01-115C |
| Plaintiffs, | 01-116C |
| v. | 01-249C |
| THE UNITED STATES, | |
| Defendant. | |

Courtroom 4, Room 501
National Courts Building
717 Madison Avenue, N.W.
Washington, D.C.

Thursday,
September 20, 2001

The parties met, pursuant to the notice of The Court, at 4:10 p.m.

BEFORE: HONORABLE DIANE G. WEINSTEIN
Judge

APPEARANCES:

For Plaintiff Florida Power & Light:

ALEX D. TOMASZCZUK, ESQUIRE
JAY E. SILBERG, ESQUIRE
DEVON HEWITT, ESQUIRE
Shaw Pittman LLP
1650 Tysons Boulevard
McLean, Virginia 22120-4859
(703) 730-7940

For Plaintiff Commonwealth Edison Company:

NORM HIRSCH, ESQUIRE (TELEPHONICALLY)

For Plaintiff Tennessee Valley Authority:

PETER SHEA, ESQUIRE (TELEPHONICALLY)

For Plaintiff Southern Nuclear Operating Company:

RONALD A. SCHECHTER, ESQUIRE
JEFF HANDWERKER, ESQUIRE
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

STANFORD BLANTON, ESQUIRE (TELEPHONICALLY)
Balch & Bingham

For Plaintiff Sacramento Municipal Utility District:

HOWARD N. CAYNE, ESQUIRE
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

TIM McDONALD, ESQUIRE (TELEPHONICALLY)

APPEARANCES: (Continued)

For Plaintiff Yankee Atomic:

JERRY STOUCK, ESQUIRE
ROBERT L. SHAPIRO, ESQUIRE
PETER SKALABAN, ESQUIRE
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5879

For Plaintiff Wisconsin Electric:

MARTIN P. WILLARD, ESQUIRE
DON CARNEY, ESQUIRE
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(204) 434-1675

For the Defendant:

HAROLD D. LESTER, JR., ESQUIRE
MARIAN E. SULLIVAN, ESQUIRE
United States Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-6288

that hopefully we would get most of the factual discovery done without having to revisit.

THE COURT: All right. I don't recall, does this proposed coordinated schedule deal with experts?

MR. TOMASZCZUK: There is a -- I believe there is a footnote regarding experts, Your Honor. It's page 6, footnote 2, which essentially was a reservation of rights to submit expert reports or conduct expert witness discovery as needed after the discovery addressed in this motion is completed. So I think Mr. Hirsch's recollection and representation is accurate.

THE COURT: Okay. Mr. Shapiro, anything else to report on Yankee's discovery, whether it relates strictly to this or not?

MR. SHAPIRO: Discovery is proceeding in the Yankee cases and even on the last point, on expert witness reports, the Yankees have made comprehensive pre-trial submissions that include full expert witness reports. Those were done back in December of 1999. We have produced lots of documents to the government, we have responded to extensive interrogatories from the government.

At this point, we're simply waiting for -- we assume the government will want to take depositions of fact witnesses and experts. They have a December 3rd deadline. We're waiting for them to take those depositions and

complete their submissions.

THE COURT: Well, I'm sorry I got involved in this case at such a late stage and I understand that a lot of discovery has already taken place, but I still.think it may be useful, not only as an adjunct to whatever discovery remains, but in the task of limiting issues for trial.

I'd like to get into the merits of the case, to some extent, and try to get a sense of what the plaintiffs' theory of damages -- I mean, I guess here we're talking about damages in the broader sense as a measure of damages that could depend on the schedule and other such things, and I'd like to get into the question of whether this being a breach of contract action, we need to stray very far afield from what is in the contract itself.

The contract has an integration clause, there certainly was lots of discussion before the regulations which set up the provisions of the contract were issued, so frankly I'm -- it's unclear to me why we need to get into a lot of detail as to what the government thought when or what plaintiffs thought when unless we have ambiguities in the contract, which I haven't seen addressed anywhere.

And for these purposes, given that the contract refers to the Department of Energy's authority to do so, the '95 APR as far as I can see looks to me like something contemplated by the contract and agreed to by the parties in

the contract. So maybe I'm coming at this with too narrow a focus, but I hate to see too much energy expended on issues which simply may not be issues and on discovery of facts that may not be relevant to the legal issues.

In addition, it appears that there really are -- that there are only a limited number of issues remaining on the schedule question. If plaintiffs' counsel would speak up to the extent you disagree, my reading of the transcript of Judge Wiese's hearing and maybe this is based to some extent on what Mr. Lester said, was that there's not really that much of an issue as to the queue or order question.

Disagreement?

MR. TOMASZCZUK: I think at least for the nine utilities I represent, I think that's basically an accurate statement.

MR. SILBERG: Queue and order.

MR. TOMASZCZUK: Queue and order. Yes.

THE COURT: Like Q&A? Similarly, on the exchange issue, I guess other than in the Yankee cases, that's no longer one that is being pursued?

I'm sorry?

MR. SCHECTER: It may also be an issue, Your Honor, in the Sacramento Municipal Utility District case.

THE COURT: Okay.

MR. SCHECTER: Which is also a shut down utility.

THE COURT: Okay. And the priorities questions, is there any dispute over what the priorities provided by the contract are? The shutdowns and the old fuel?

MR. TOMASZCZUK: I think that at least the nine utilities that I represent, Your Honor, recognize that the contract says what it says with respect to priority for oldest fuel first. I think just to cut to the chase, I mean, I think one of the key issues is what we've referred to as the take rate or the acceptance rate and there is some work to be done.

And I would also note, Your Honor, with respect to the -- I mean, among other things, the 1995 APR ACR on its face says it's not binding. There were any number of other documents that --

THE COURT: But that means it's not binding on the government, doesn't it?

MR. TOMASZCZUK: Well, I think it's not binding on --

MR. BLANTON: It's not binding on either party, Your Honor --

THE COURT: Well, there we go. So then it's not in the contract. But the point remains that DOE had the authority to issue such schedules and to put in them whatever it wanted to basically as long as it abided by

these priorities. Isn't that correct?

MR. TOMASZCZUK: The problem, Your Honor, is that there are any number of other documents that DOE also published at or about that time and later in time which take very differing views with respect to the take rate or the acceptance rate.

THE COURT: But so what? If you've got an integrated contract that says DOE can do whatever it wants, why does it matter what happened after the contract was executed? The contract doesn't say that DOE is bound by subsequent representations. I mean, that just -- in fact, it says the reverse.

MR. BLANTON: Your Honor, this is Sam Blanton again for Southern. We would argue that that is not what the contract says.

THE COURT: Okay.

MR. BLANTON: That the contract does not give DOE carte blanche to define what its own obligation is; rather, we're in a situation where a term is missing from the contract and it's up to the Court to decide what a reasonable acceptance rate is. And then all of these facts that I heard Mr. Tomaszczuk referring to about the other schedules are relevant to that.

THE COURT: Well, I'm not sure a missing term gives rise to an ambiguity. A missing term, if it's

intended by the parties is simply something the parties did not want to include in the contract. I've got a case here, I'm trying to find it.

Well, I don't have the exact case here, but I have a case that says a missing term does not equal an ambiguity.

MR. BLANTON: Your Honor, we would certainly like to address that before we get too far down the road, if that's an issue.

THE COURT: Absolutely. You will be given the opportunity to address anything you'd like, but I do want to raise these questions because I hate to see any more money being spent on these cases if it's not strictly necessary. And I don't know -- I haven't seen all the material in all these cases, so I don't know if this issue has come up in the past.

I mean, there's no question that there was a contract and that it was breached, but the breach was caused by the failure in '93 to start making provisions to dispose of the material. Damages arising from that breach is something totally different.

It's certainly conceivable that you could have a breach of a contract and no damages. I'm not saying that's the case here, obviously, there would be damages, but it just doesn't seem to me as though the issues -- that certain issues which seem kind of basic to me but I may be totally

off track need to be addressed as soon as possible.

Mr. Lester?

MR. LESTER: Your Honor, if I could, our hope was that this process, after we received the discovery responses from each of the plaintiffs, which I think are anticipated to be October 9th, that we would be able to get a definitive position from each particular utility on many of the issues the Court has discussed today and then we would hope, to the extent there is no disagreement on things, be able to stipulate to certain things, to really narrow down what it is we're focusing on. And where there appears to be disagreement amongst the utilities, then at that time figure out how to approach those inconsistencies.

THE COURT: Well, but maybe we could figure that all out right now. Why do we have go to any further in the discovery process?

I mean, it seems to me that the plaintiffs know what their theories are. I would be curious to know if in your wildest dreams you found the perfect piece of evidence in all of this discovery at the Department of Energy, what would it be?

Mr. Tomaszczuk?

MR. TOMASZCZUK: Well, I think we've already located documents which establish that the take rate would have ramped up quickly to 3000 MTU, metric tons, per year

and that is consistent with our theory of the case and our theory as to what the schedule would have been had DOE performed.

As I understand, the government's position --

THE COURT: But not according to the '95 schedule.

MR. TOMASZCZUK: Not according to the 1995 APR ACR which on its face says it's not binding. And that was also the last one that was issued.

THE COURT: But then what do you use?

MR. TOMASZCZUK: We would submit, Your Honor, that any number of other documents which were issued at or about that time and thereafter -- and before establish that DOE actually intended the facility, had it built one and presumably is still planning to build one out at Yucca Mountain, to ramp up to 3000 MTU per year. So we would submit that that is the more reasonable number.

THE COURT: And did plaintiffs receive any notice of the government's intention during this period or is this material that you have found during discover? In short, have plaintiffs relied on some government representation that thus and such a rate would be used?

MR. TOMASZCZUK: Yes. There are any number of officially released and published documents by DOE using the 3000 MTU number.

THE COURT: But wait a minute. But did they say

this is guaranteed to be the rate that you are going to get in '93?

MR. TOMASZCZUK: I think most of the documents, they say they're not binding, which is also true of the 1995 APR ACR. They're not --

THE COURT: But then it's not binding on either party.

MR. TOMASZCZUK: Well, if it's not binding on either party, then we have to establish through this process what the rate would have been had DOE performed the contract. Our theory of damages is relatively straight forward. These were our actual costs incurred as a result of DOE not coming and they are substantial and significant.

Take, for example, Northern States Power Companies had to build an entire dry storage facility that but for DOE's breach they wouldn't have had to build. It's an incredible undertaking.

THE COURT: Well, that's the question, whether they would have had to build it but for DOE's breach.

MR. TOMASZCZUK: Well, that is the question.

THE COURT: If DOE wouldn't have gotten to them until ten years later and then at a very low pick up rate, although I guess in order to calculate that at some point you enter into the old fuel category, so you can't sit around forever, right? But once all the old fuel gets

exhausted --

I mean, I'm just trying to think of what the worst case would be and what the best case would be in terms of pick up. If all the old fuel went first and nobody else got picked up, of course, that depends on what the rate is, of course. But --

MR. BLANTON: But, Your Honor, the old fuel is scattered among a lot of different utilities.

THE COURT: No, I understand that. But if it's picked up in the order of priority oldest fuel first and all the old fuel is exhausted before all the new fuel, which I guess has to happen -- or is there a half and half?

MR. SHAPIRO: Each utility. The utilities can decide which assemblies go at which time, but the allocation that a utility gets in any given year is based on its share of the oldest fuel first.

THE COURT: So the allocation is for oldest fuel. You can throw away new fuel.

MR. SHAPIRO: Well, you can deliver new fuel, but your allocation is based on oil fuel.

THE COURT: It's based on the old fuel. And really you don't care whether it's old or new, it's just the storage facility.

MR. SHAPIRO: The utilities may well -- it may well matter to individual utilities.

THE COURT: Really?

MR. SHAPIRO: Yes.

THE COURT: Whether it's old or new?

MR. SHAPIRO: Right.

THE COURT: Why?

MR. SHAPIRO: Depends on where the fuel is. They want to empty their pools first, they may want to empty their storage first.

THE COURT: But otherwise, it wouldn't be -- otherwise, they wouldn't particularly care. I mean, it's just as easy to store old as new.

MR. SHAPIRO: Not necessarily, but there are technical reasons that may benefit sending one rather than another.

THE COURT: Okay.

MR. SHAPIRO: But the rate is the key thing. DOE can say well, if none of these rates are binding, then we could take one assembly --

THE COURT: A year.

MR. SHAPIRO: A year.

THE COURT: Right.

MR. SHAPIRO: And that clearly isn't a reasonable interpretation of a contract for which we've paid $16 billion.

THE COURT: Well, then, maybe that's the starting

point.

MR. SHAPIRO: What is the reasonable interpretation of DOE's obligation.

THE COURT: No, maybe the starting point is what did you pay and what would you have -- of course, there was no alternative.

MR. SHAPIRO: The payment is based not on the fuel you take, but how much --

THE COURT: But it was a cost recovery. The payment was supposed to be based on --

MR. SHAPIRO: Recovering the entire cost of the DOE program.

THE COURT: It was a user fee, right, as opposed to -- pardon me?

MR. SILBERG: Yes. Recovering the entire cost of the DOE program for taking our fuel.

MR. SHAPIRO: Perhaps, Your Honor, perhaps we might be able to illuminate this because this is --

THE COURT: Okay. Go ahead.

MR. SHAPIRO: This is set out the Yankee companies' pre-trial submissions, this very point.

THE COURT: Okay.

MR. SHAPIRO: We feel that there is indeed an open term and that it is the Court's obligation to supply a reasonable term to fill in that open term. And, indeed,

looking historically at how the contract was entered into, the statute, the Nuclear Waste Policy Act, mandated that the statute be crafted fairly quickly. It may not be surprising that such a key term, how fast the spent fuel had to be picked up, would have been left open to be supplied with a reasonable term. And that's also --

THE COURT: There were seven commentors who raised the issue and DOE basically said we're not dealing with it.

MR. SHAPIRO: Because they didn't know what a reasonable term would be. Indeed, the full cost recovery aspect of the contract contemplated that DOE had essentially as much funds as it needed to do something that would be reasonable under the circumstances.

THE COURT: But these seven commentors also raised the point that there were no remedies set out in the contract for DOE's failure to start pick up in -- whenever it was --

MR. SILBERG: 1998.

THE COURT: '98. And the reaction from DOE was, you know, well, we think we're going to make the '98 schedule. But if they had wanted to put something in, you could certainly come up with a formula, couldn't you? I mean, you could say, well, you know, for every mega whatever we'll pay you so many thousands of dollars. I mean, you can't say that there wouldn't have been a way to

set up liquidated damages.

MR. SHAPIRO: DOE certainly had the -- they were the drafters of the contract.

THE COURT: Right.

MR. SHAPIRO: They received comments, they took a few suggestions made such as the one making clear that utilities could swap their allocation rights.

THE COURT: Right.

MR. SHAPIRO: They didn't take many. Surely at that time in 1983 if DOE had put in a term rather than leaving it open and said, you know, we're going to take 3000 MTU per year, we may well not have this dispute. That's not what DOE did. They left it open for it to be supplied by an open term.

THE COURT: Well, they didn't say we left it open so the courts can decide it for us. I mean, that doesn't --

MR. SILBERG: Your Honor, if I could go back to the contract, I don't believe any of the comments addressed the question of what the rate was. I think the comments went to the issue of will DOE begin to perform in 1998 and, if so, what remedies there might be if DOE does not -- should DOE establish milestones. And DOE chose not to address those comments, saying the 1998 obligation was clear enough. I don't believe that any of the --

THE COURT: Yes. You may be right. Hang on.

Here we go. DOE performance standards.

MR SILBERG: Correct. And that did not deal with the rate of acceptance.

THE COURT: Well, but come on. That's certainly subsumed in that notion.

MR. SILBERG: No, it wasn't.

THE COURT: No? Why not?

MR. SILBERG: We were there. I was involved in writing those comments and that was not an issue which was addressed at that time.

THE COURT: Then what does performance standards mean?

MR. SILBERG: Will they begin to perform in 1998, are there milestones by which we can see that they're getting to a point where they can begin to perform by 1998, but it did not go to the question of, well, is it 900 metric tons or 3000 metric tons.

In fact, all the early documents back in that timeframe were based on 3000 metric tons. The 900 metric ton document didn't come in until DOE was clear that it was going to breach the contract, then it suddenly switched to 900 metric tons. All the other documents and, in fact, the actual design of the facility is based on 3000 metric tons.

THE COURT: But that's not in the contract.

MR. SILBERG: And neither is the 900 metric tons.

THE COURT: Right. No, I agree.

MR. SILBERG: And therefore do you leave it to DOE to decide one metric ton is enough? Or do you apply a reasonableness standard to see what actually makes sense and what DOE was actually planning?

THE COURT: Well, I think that's a legal question and I'm not sure that the Court necessarily can provide a term based on reasonableness. But you said you've briefed this issue already, yes?

MR. SHAPIRO: We feel that ultimately it's a matter of -- well, it's part of our pre-trial submissions. We were required and we did submit a legal brief. It was limited to be rather brief, it did not go into detail on all the issues, but it is -- we looked at it as to what would have happened absent the breach.

We feel that the 1995 ACR APR fairly explicitly on its own terms is breached infected. That document states that that 900 MTU acceptance rate in there is based at least in part on the fact that the DOE knew it was not going to have a repository operational and that if it was able to perform at all, it would be through what was contemplated to be a monitored retrievable storage facility which had a fixed acceptance amount of 10,000 MTU. In fact, one of the documents we've received in discovery points to that fact. One of the things we're hoping to get through more discovery

is more documents, more explanation of, gee, how did that 1995 ACR get put together?

One of the criticisms we've seen of that at least internally within DOE and its contractors is that, gee, if you're only going to take 10,000 MTU, you might as well at least take it faster so that utilities can avoid more cost. But even within the government, DOE and its contractors, it was not viewed as a means of saying what the government's obligation was. At that time, the government was clearly trying to deal with the fact that they were going to breach the contract, they were not going to make their deadline.

THE COURT: Okay.

MR. TOMASZCZUK: I would just also say on behalf of the operating utilities, Your Honor, we have not briefed this issue.

THE COURT: You have never briefed this issue?

MR. TOMASZCZUK: No.

THE COURT: Okay. Well, I think it's important. I know you think you're going to get to it, but not until the conclusion of discovery, including depositions and all. Or you've got your interrogatories and requests for admissions out there?

MR. LESTER: Right. Yes. And when we receive those on October 9, that's when we hope we will be able to make --

THE COURT: And are those keyed to deal with the sorts of issues I've raised?

MR. LESTER: Yes, Your Honor. I believe they are.

THE COURT: Okay. Well, then, I would ask you to look those over and make sure --

MR. LESTER: Oh, believe me, Your Honor. We will. Very thoroughly.

THE COURT: -- you've covered it all. I mean, I think it's a real problem because obviously the plaintiffs are entitled to be compensated and yet it seems exceedingly difficult to come up with a measure that really corresponds with what the parties' intentions seem to have been at the time the contract was entered into. But maybe you can convince me that reasonableness is all I need to look at, but I tend to be more of a strict constructionist on contract theory, so we'll see. But, of course, this is not entirely my decision, except that insofar as -- well, this is something I guess I would have to bring back to the other judges, but I would want to know what the parties' position was at the time that I did that.

Now, what you're proposing to do is to file a motion for summary judgment?

MR. LESTER: It's quite possible, Your Honor, yes, that we would try to resolve these -- we are not looking to go to trial on all these issues. Believe me. In some,

particular issues may be more easily resolvable on motion than others, but we are going to be looking very hard at maximizing that type of process.

THE COURT: Okay. Well, then, I will bless your proposed coordinated discovery order and expect that -- it sounds as though you're right on schedule, which is admirable, and happens infrequently in my experience. I am prepared to help in any way during the course of discovery. I don't generally take telephone calls but I will make an exception in this case.

Are there any other issues that need to be raised at this point?

Mr. Tomaszczuk?

MR. TOMASZCZUK: Just a moment, Your Honor.

THE COURT: Okay. Anyone on the telephone?

MR. HIRSCH: Judge, this is Norm Hirsch in Chicago.

THE COURT: Yes?

MR. HIRSCH: Going back to the issue you raised at the beginning of the call, Judge Hewitt in our case had already entered a liability determination.

THE COURT: Oh, okay.

MR. HIRSCH: And I think it's happened in at least one other case:

MR. TOMASZCZUK: Judge Wiese has in Northern

States, as well, Your Honor.

THE COURT: Okay. Well, let's just make sure that everybody has one in place. I'll make sure that everybody gets to it.

MR. LESTER: We'll discuss that with the plaintiffs' counsels and look to see which ones -- I don't have a list of which ones have liability orders now and which don't, but --

THE COURT: Okay. Well, why don't you just file them in all?

MR. LESTER: That's a good idea, Your Honor.

THE COURT: Okay.

MR. SHAPIRO: Your Honor, I wanted to raise one other concern. It may not become an issue but if we do -- if there are motions filed on this, I did not want it to be a surprise to the Court, given that we were at least aware of the concern at this time.

Consistent at least with the procedure in the parties' proposal for coordinated discovery, which has a deadline for the parties to seek third-party discovery, the government has served us with notice of subpoenas to perhaps every other utility that has a contract that has not filed suit. They have also served a document subpoena on the Nuclear Energy Institute which is a trade association for nuclear cases. These are very extensive, substantial